## HELD AT LITCHFIELD, FOR THE COUNTY OF LITCHFIELD,

### ON THE FOURTH TUESDAY OF MAY, 1879.

#### Present,

PARK, C. J., CARPENTER, PARDEE, LOOMIS, AND GRANGER, JS.

---

JAMES TERRY *vs.* THE EAGLE LOCK COMPANY AND OTHERS.

A court of equity will in many cases refuse to interfere with a corporation at the instance of a stockholder, in respect to an unauthorized contract which has been fully executed, when, if the same stockholder had applied in season for an order to restrain the execution of the contract, the court might have felt bound to grant the relief prayed for.

Especially is this so where the petitioner has stood by and allowed the illegal transaction to be consummated, and has induced or allowed others to become interested in the corporation in the belief that the existing state of things was legal.

The Eagle Lock Co., a joint stock corporation located in this state, was in 1871 carrying on the business of making locks, and then had a capital of $100,000. At that time the Gaylord Co. was a like corporation, organized under the laws of the state of Massachusetts, and there carrying on principally the same business, and selling in the same markets. After a negotiation between the two companies, the stockholders of the Eagle Lock Co. voted to buy all the property of the Gaylord Co for $50,000 of new stock of the former company, to be created out of its surplus, the latter company to preserve its organization, and its business to be carried on by trustees for the benefit of the Eagle Lock Co. The purchase was made, the stockholders of the Gaylord Co. transferred all their stock to the Eagle Lock Co , and the $50,000 of new stock was created and issued to them in payment. The arrangement proved a profitable one and for five years large dividends were made from the general earnings among all the stockholders. The new stock had during this time been by successive transfers so mingled with the old that it could not be traced. *T*, one of the old stockholders of the Eagle Lock Co., had in 1871 opposed and voted against the action of the company in the matter, but took no steps to prevent the consummation of the arrangement, and down to 1876 had done nothing to bring into question the title of the Eagle Lock Co. to the Gaylord Co. property, and its right to enjoy the benefit of the arrangement, and no question was raised upon these points by any one, while the stock of the company had

been largely bought and sold in the belief that the proceedings were legal and
that the stock was $150,000, *T* himself having in 1872 sold as administrator of
his father's estate a large amount of stock, and since the present suit was
brought a number of shares of his own, the purchasers, with a single excep-
tion, not being informed of any supposed invalidity in the proceedings of the
company.    Upon a bill in equity brought by *T* to enjoin the Eagle Lock Co·
from further managing the Gaylord Co. as an existing and separate organiza-
tion, and praying that the whole arrangement be set aside, and the $50,000 of
new stock distributed among the persons who were stockholders at the time it
was created, and for other relief, it was held, (without deciding whether the
Eagle Lock Co. had power to make the arrangement,) that the petitioner had
no sufficient standing in court to enforce his demand.

Aside from this, it did not appear that the transaction had been injurious to the
petitioner.

And there was no ground upon which the stockholders of the Gaylord Co. could
equitably be compelled to give up the $50,000 of stock they had received, even
if they still held it.    They had paid a full consideration for it in transferring
their stock to the Eagle Lock Co.

And the same amount of stock could not be created for the purpose and added to
the capital for the benefit of the holders of the stock at the time of the
increase, as that would be a wrong to the persons who had become owners of
the stock since.

And the company could not be required to pay an equivalent in cash, as that, by
reducing the assets, would equally wrong the later purchasers of the stock.

And the court would not make any decree affecting these parties unless they
were all before the court.

And held that there was no legal objection to the mode adopted for carrying on
the business of the Gaylord Co. as a distinct corporation by trustees appointed
for the purpose.

And it seems that the Gaylord Co., while thus operated, might lawfully engage
in any business authorized by its fundamental law.

How far the doctrine of *ultra vires* applies to trading and manufacturing corpor-
ations under our joint stock laws:   *Quære.*

The stockholders of the Eagle Lock Co. on the 5th of August, 1875, voted to
increase its capital stock two thousand shares out of the surplus earnings of
the company.    This increase was for a special object, though not so stated
in the vote, which object immediately after failed.    Thereupon a special meet-
ing of the stockholders was held on the 18th of the same month and before
any action had been taken under the vote to increase the stock, and that vote
was rescinded.    No certificates of the new stock were ever issued, nor any
certificate of the increase filed, as required by law, with the town clerk or sec-
retary of the state.    Thus matters stood until July, 1876, when the present
petition was brought, praying that the petitioner's share of the stock thus cre-
ated, upon the basis of his then ownership of the stock, might be issued to
him or its value paid to him in cash.    In the meantime there had been impor-
tant transactions of the company, and a large amount of stock had changed
hands, all upon the basis of the unincreased capital, all of which was known
to the petitioner.    Held—1. That the mere vote to increase the stock did not
give it an existence, so that the petitioner as a stockholder acquired a vested

interest in it. 2. That the company had full power to rescind the vote increasing the stock. 3. That the petitioner by his acquiescence for so long a time, with knowledge of all the facts, had lost whatever equity he might originally have had.

BILL IN EQUITY to set aside certain transactions of the respondent corporation, to compel the issuing to the petitioner of certain shares of its stock, and for an injunction, with a prayer for general relief; brought to the Superior Court in Litchfield County. The following facts were found by a committee upon the bill and the answer of the respondents.

The Eagle Lock Company is a corporation located in the town of Plymouth, in this state, which was, in the year 1854, organized as a joint stock corporation under the general statute with regard to such corporations then in force, with a capital stock of $85,000, divided into thirty-four hundred shares of twenty-five dollars each; the object of which association, and the business to be carried on by the corporation, were stated in the articles of association of the company as follows: "To deal in, manufacture and sell, all kinds of chest, cupboard, drawer, wardrobe, trunk, pad and other locks, and bag frames, which are made in whole or in part of brass, iron, steel, wood or metals of any name or description, whether wrought or cast, and to purchase any and all things necessary to use in manufacturing as aforesaid; also to buy, sell and deal in goods, wares and merchandise, manufactured in whole or in part of any of the aforesaid materials, and all such property and estate as may be necessary or incidental to the prosecution of said business."

Its original capital had been increased to $100,000, and continued such till September 11th, 1871, when it was increased, in the manner and for the purpose hereinafter stated, to $150,000, at which it remained till August 5th, 1875.

James Terry, the father of the petitioner, died on the 19th of April, 1871, leaving a will by which he appointed Joseph H. Adams and R. D. H. Allen his executors. Adams died before the testator. On the 22d of April, 1871, the will was duly proved before the court of probate, and the petitioner

was appointed administrator with the will annexed, in the place of Adams. Allen has never resigned his trust as executor, but has acted therein only by signing instruments of conveyance, and a notice of the settlement of the administration account. The petitioner has settled the estate in all other respects. At the time of his decease the testator was the owner of four hundred and fourteen shares of the stock of the Eagle Lock Co., which remained the property of his estate till January 1st, 1872, when it was distributed according to the terms of his will, the petitioner receiving sixty-nine shares thereof. On the 11th of September, 1871, the petitioner owned in his own right forty shares of the stock, and on the 5th of August, 1875, he owned one hundred and fifty shares.

On the 11th of September, 1871, the Gaylord Manufacturing Company was a corporation under the general laws of the state of Massachusetts, having been organized in the year 1863. In its articles of association its object was stated as being that "of carrying on the business of manufacturing and selling hardware and leather goods." It then owned a factory, water power and real estate situated in the town of Chicopee in the state of Massachusetts, which were used in and connected with its manufacturing business; also tools, machinery, stock and manufactured goods. The Gaylord Manufacturing Co. and the Eagle Lock Co. were engaged in business substantially of the same character and kind and in the same markets. The capital stock of the Gaylord Company was $100,000, and the par value of its shares was $100.

The officers and stockholders of the two corporations, believing in good faith that the interests of both companies would be furthered thereby, agreed that the Eagle Lock Co. should purchase the factory and other property of the Gaylord Co., and pay therefor $50,000 in the stock of the Eagle Lock Co., which stock was to be created by the Eagle Lock Co. and to be issued to the stockholders of the Gaylord Co. at the rate of two shares of the new stock for one share of the Gaylord Co. stock transferred to the Eagle Lock Co.

On the 11th of September, 1871, at a meeting held in pursuce of proper notice, the stock was created; and it was issued to the stockholders of the Gaylord Co. in pursuance of the arrangement, and under the following resolutions of the Eagle Lock Company:

"*Resolved*—That the capital stock of the Eagle Lock Co. be increased two thousand shares, and that the directors be authorized to issue to each of the stockholders of the Gaylord Manufacturing Co. of Chicopee, Mass., certificates of two shares of the stock of the Eagle Lock Co., when they shall transfer to trustees appointed as hereinafter provided, one share of the stock of the said Gaylord Manufacturing Co.; the par value of the said Gaylord Manufacturing Co. stock being one hundred dollars per share.

"*Resolved*—That we appoint now, and at each annual meeting hereafter, a board of eight trustees, who shall receive and hold the certificates of said Gaylord Manufacturing Co. stock, and shall hold the office of trustee until the next annual meeting after their election, or until their successors shall be appointed, and shall have power to fill all vacancies that shall occur during the time of their office; who shall organize by the appointment of a president from one of their number, and of a secretary and treasurer, and who shall take the entire management of the affairs of said Gaylord Manufacturing Co., keep an account of all their receipts and disbursements, and make dividends of the profits of said company at their discretion, and pay over said dividends to the treasurer of the Eagle Lock Co., and make a full report of their standing and affairs at each annual meeting of the Eagle Lock Co."

The petitioner was present at the meeting of September 11th, 1871, was opposed to the amalgamation with the Gaylord Co., and previous to the passage of the resolutions he, in conversation with one and another of the stockholders, objected to it, and voted against the adoption of the resolutions.

In pursuance of the resolutions trustees were appointed. The Eagle Lock Company then had a surplus of $250,000.

No purchase was made of the franchise or corporate rights of the Gaylord Co. further than would result from the following facts: The two corporations were advised that a proper and sufficient conveyance of the property of the Gaylord Co. could be made by transferring all the stock of the latter company to trustees who should hold the same for the sole use and benefit of the Eagle Lock Co.; and such conveyance was made by the stockholders of the Gaylord Co. of all their stock to such trustees, who have ever since held the same and paid over all earnings and profits of the manufacture and sales by the Gaylord Co. to the Eagle Lock Co. The corporations by their officers intended to give and receive a full conveyance of all the property of the Gaylord Co. to the Eagle Lock Co., and supposed that the transfer of the stock to trustees effected that result. No other conveyance of the property has been made.

In the stock ledger of the Eagle Lock Co. accounts appear with the stockholders of the Gaylord Manufacturing Co. in which are charges of stock of the Eagle Lock Co., which are balanced by credits for stock of the Gaylord Co., transferred to the trustees; and certificates of stock of the Eagle Lock Co. were duly issued to them.

The Gaylord Manufacturing Co. has continued to exist as a corporation, and has made its returns to the authorities of Massachusetts under the corporation laws of that state. The proceeds of the business have been received by the Eagle Lock Co. through the trustees.

In the course of their business the Gaylord Co. has made and sold swords, the manufacture and sale of which has been a source of profit.

Between the 11th of September, 1871, and the bringing of this petition, the Eagle Lock Co. has paid upon the stock issued to the stockholders of the Gaylord Co., in dividends, $70,000 more than the Eagle Lock Co. had during the same time received from the Gaylord Co.; but during this period the sales of the Eagle Lock Co. amounted to $1,700,000, and in consequence of this arrangement it has been enabled to make sales at a profit much larger than the $70,000, over and

above what they would have made had this arrangement not been made, namely, fifteen per cent. more on the total amount of sales.

At a meeting of the stockholders of the Eagle Lock Co., held on the 5th day of August, 1875, in pursuance of a special notice, the following votes were passed:

"*Voted*, That the capital stock of the Eagle Lock Company be, and the same is hereby, increased two thousand shares, and that said increase be out of the surplus earnings of the company."

"*Voted*, That the directors be authorized and directed to cause to be issued said stock to the present stockholders *pro rata*, according to the stock respectively owned by each, and that any fractional share may be adjusted by the payment of money at the rate of four dollars for one."

The record not showing by what majority the vote was passed, the respondents objected that it was not competent for the petitioner to show, *aliunde* the record, that it was passed by a vote of stockholders holding two-thirds of the whole stock. And the petitioner objected that it was not competent for the respondents to show whose stock was voted upon in the affirmative. If parol evidence was admissible to prove how the vote was passed, *aliunde* the record, then it was agreed by the parties that persons representing two-thirds of the stock of the company did vote therefor, provided the stock issued as before stated to the Gaylord Manufacturing Co. stockholders and voted on, was legally and properly voted on; otherwise it was not passed by a two-thirds vote, but by a majority vote only. The vote was not a stock vote by ballot, but was taken *vivâ voce.*

No certificate of this increase of stock was ever filed in the office of the secretary of the state, or in the office of the town clerk of Plymouth.

It was stated at the meeting of August 5th, 1875, and before the above votes were passed, that the stock was proposed to be created and issued to the stockholders to be by them transferred to N. G. Miller, at the rate of $100 per share, to enable the Eagle Lock Co. to obtain his services as

president and manager of the company, it being deemed advantageous to the company to procure his services; and the increase of stock was voted for that special purpose, it being supposed that the offer of the stock would be an inducement to Miller to devote his services to the company.

The petitioner was present at the meeting and voted in favor of the passage of the vote, and after it was passed signed an agreement with the other stockholders, that their shares of the new stock might be issued to Miller at $100 per share.

Before the 18th of August, 1875, the proposed arrangement with Miller became impracticable and could not be carried into effect.

On the 18th of August, 1875, in pursuance of notice a meeting of the stockholders of the Eagle Lock Co. was held, at which a vote was passed rescinding the vote of August 5th increasing the capital. The petitioner however was not present at this meeting, and received no actual notice of it, being out of the state.

Up to the date of the petition there was no dispute of the title of the Eagle Lock Co. to the property purchased of the Gaylord Manufacturing Co., and the Eagle Lock Co. has enjoyed all the benefits and fruits of the purchase, and its rights had never previously been questioned; all which was known to the petitioner.

No separate account has been kept by the Eagle Lock Co. with the holders of the stock issued September 11th, 1871, and it has been sold by the holders to other parties, and again resold by them, so that at the time of bringing this bill a large amount of the same had become intermingled with the original stock of the Eagle Lock Co., and cannot be distinguished from it. There are holders of this stock who were not individually made parties to the present suit.

The trustees made annual reports to the Eagle Lock Co. of their proceedings in relation to the trust, but there was no evidence that the petitioner ever saw the same.

On the 11th of September, 1871, the $50,000 of stock issued by the Eagle Lock Co. to the holders of the stock of

the Gaylord Manufacturing Co. was of the same value as the $100,000 of the stock of the latter transferred to the trustees. The $50,000 of stock created on the 11th of September, 1871, and the $50,000 created on the 5th of August, 1875, were created out of the surplus earnings of the Eagle Lock Co., which were ample for that purpose.

The petitioner was aware that the Eagle Lock Co., from September 11th, 1871, till the bringing of the present suit, was paying dividends on the increased stock, and did not object to its paying such dividends, nor to its taking the earnings of the Gaylord Co. The petitioner knew that the stock of the Eagle Lock Co. was being bought and sold between September 11th, 1871, and July, 1876, and that its capital stock was then $150,000.

On the 25th of June, 1872, the petitioner, as administrator on the estate of his father, transferred to sundry persons the four hundred and fourteen shares owned by the deceased, and the company issued certificates to the transferees therefor, and he did not inform them of the liability of the proceedings of September 11th, 1871, to be annulled. The petitioner after the present suit was brought transferred one hundred and sixty shares of the stock to three different parties, and at the present time is the holder of but one share. In making these transfers he informed one of the purchasers that the arrangement with the Gaylord Co. was liable to be broken up, or that there was a liability to the issue of $50,000 more stock, but he informed neither of the others.

Upon these facts the case was reserved for the advice of this court.

C. B. Andrews and J. R. Buck for the petitioner.

1. The action of the Eagle Lock Company in the purchase of the Gaylord Manufacturing Company was without sanction of law, and was therefore void. The purposes stated in the articles of association of the Eagle Lock Co. were the only ones for which the company was formed. It could lawfully engage in no other business. The statute provides that "the purpose for which every such corporation shall be

Terry *v.* Eagle Lock Co.

established *shall be specified* in its articles, and may be changed with the consent of all the stockholders, by amending its articles, &c." Gen. Statutes, p. 311. It is clear that the articles specified must be strictly followed by the corporation in conducting its business. The purchase of the Gaylord Co. was not authorized by the articles of association. The power to manufacture and deal in locks and bag frames could not be said to carry with it the power to go outside of the state and purchase bodily an entire corporation, franchise and all. To buy and sell locks and bag frames is one business, to buy and sell foreign corporations is another. It may be claimed that authority was given for this purchase under the last clause of the articles, which is as follows: "Also to buy, sell, and deal in goods, wares, and merchandise, manufactured in whole or in part of any of the aforesaid materials, and all such property and estate as may be necessary or incidental to the prosecution of said business." But can it be necessary, in carrying on the business of making locks and bag-frames, that the respondents should own another corporation which is itself engaged in the manufacture of swords? But it may be urged that the purchase was a profitable one for the respondent, and that it destroyed a competing company. This cannot make the action valid. To destroy competition is oftentimes profitable, but the statute has not authorized the formation of corporations for that purpose, but to encourage and promote legitimate business. Such action is manifestly against public policy. The law will not permit competition to be destroyed. Its policy should be to encourage it. A corporation has only such rights as are conferred upon it by statute. It has no natural rights. *Head* v. *Providence Ins. Co.*, 2 Cranch, 127; *Firemen's Ins. Co.* v. *Ely*, 5 Conn., 560; *Catlin* v. *Eagle Bank*, 6 id., 240; *Berlin* v. *New Britain*, 9 id., 180; *New London* v. *Brainard*, 22 id., 555; *Savings Bank* v. *Meriden Agency Co.*, 24 id., 159; *Occum Co.* v. *Sprague Manuf. Co.*, 34 id., 541; *The People* v. *Utica Ins. Co.*, 15 Johns., 383; *Mann* v. *Butler*, 2 Barb. Ch., 362; *Whittenton Mills* v. *Upton*, 10 Gray, 582; *Stevens* v. *Rutland & Bennington R. R. Co.*, 29 Verm., 545;

*Dodge* v. *Woolsey*, 18 How., 341; *Pearce* v. *Madison &c. R. R. Co.*, 21 id., 441; *Slark* v. *Highgate Archway Co.*, 5 Taunt., 792; *Broughton* v. *Manchester & Salford Water Works*, 3 Barn. & Ald., 1. The following provision was in the statutes of this state when this action was taken: "The purpose for which every such corporation shall be established shall be distinctly and definitely specified by the stockholders in their articles of association, and it shall not be lawful for said corporation to direct its operations or appropriate its funds for any other purpose." Gen. Statutes of 1866, p. 170, § 395. A majority of the stockholders of a corporation have no power to dispose of or exchange the interest of a stockholder in its assets without his consent. *Hartford & N. Haven R. R. Co.* v. *Croswell*, 5 Hill, 383; *Frothingham* v. *Barney*, 13 N. York Supreme Ct. R., 366; *Taylor* v. *Earle*, 15 id., 1; *McCurdy* v. *Myers*, 44 Penn. S. R., 535; *Simpson* v. *Westminster Palace Hotel Co.*, 8 House of Lords Cas., 712, 716. The surplus of $250,000 which the company had at this time belonged to the stockholders, and the action complained of was a misappropriation of so much of said surplus as the new stock represented.*

2. The Eagle Lock Company had no power to rescind the vote of August 5th, 1875, without unanimous consent. The record finds that the new stock of the 11th of September, 1871, and that of the 5th of August, 1875, was created "out of the surplus earnings of the Eagle Lock Company, which were ample for that purpose." At the meeting of August 5th it was voted "that the capital stock of the Eagle Lock Company be, and the same is hereby, increased two thousand shares, and that said increase be out of the surplus earnings of the company," and "that the directors be authorized and *directed* to cause to be issued said stock *to the present stockholders*." Anticipating that this vote would be carried out, a large number of the stockholders, including the petitioner,

---

* The arguments of counsel on both sides as to the power of the Eagle Lock Co. to make the arrangement which it did with the Gaylord Manufacturing Co., are given in the report of the case as being of interest to the profession, although the court did not decide the question.—*R.*

agreed to sell their portion of the increase. The testimony relative to what was said at the meeting, concerning the object of the increase, was inadmissible. The notice, and the record of the meeting showing what was done in pursuance of the notice, are the only means of ascertaining what was really done. It might have been the idle talk of bystanders. It appears that certain things were stated at the meeting. By whom the statement was made, or to whom, does not appear. *Bartlett* v. *Kinsley*, 15 Conn., 327. The record shows that the stockholders voted to increase the capital two thousand shares. It is to be presumed that the vote was in accordance with law, and that the requisite number voted. It is entirely clear that a two-thirds vote is not required to increase the stock. Compilation of 1854, p. 228, § 208; Revision of 1866, p. 170, § 394. The action taken at this meeting was a declaration of a dividend in stock, which has the same character as a cash dividend; and, from the moment the vote was passed, a debt was created from the company to each shareholder, and a majority of the stockholders had no more power to cancel this debt than they would to cancel any debt incurred in the ordinary course of business by voting not to pay it. It was the duty of the directors to issue the additional stock to the stockholders of that date, and a mandamus would lie to compel them to do it. This court has decided the question here raised in the case of *Beers* v. *Bridgeport Spring Co.*, 42 Conn., 24. This was a bill in equity, brought to compel the respondents to pay to the petitioner certain dividends which the company had declared but had afterwards refused to pay. The court says: "When the defendant corporation, by the legal vote of its directors, declared the dividend in question from profits theretofore earned and received, made the same payable without interest at such time as might be decided by the board, and ordered the amount to be placed, *pro rata*, to the credit of the stockholders upon its books, the share of each stockholder in the several amounts was thereby severed from the common fund of the corporation and became his individual property. Thenceforth the company owed him a debt,

payment of which at the proper time he might demand, and upon refusal enforce by the aid of a court of equity." At the meeting of August 18th, 1875, the company voted to rescind the vote of August 5th. The petitioner had no notice of this meeting and was not present. This action can not affect his right to his share of the new stock. The company owed him this stock, and it could not relieve itself from this debt in any way but by the payment of it.

3. The relief asked for by the petitioner is as follows: 1st. That the respondents shall desist from the management of the Gaylord Manufacturing Co.; and if the court decides that the issue of stock to the stockholders of the latter company was valid, that the Eagle Lock Co. proceed to obtain the property of that company at once. From what we have already said it is manifest that the Eagle Lock Co. is not authorized by the law of its existence to conduct the affairs of another corporation in the manner disclosed by the record. But if the issue of stock is to be sanctioned, then the company should at least receive the full benefit of the transaction. 2d. That the respondents shall desist from the manufacture of swords. Of course they have no right to carry on any business not authorized by their articles. 3d. That the purchase of the Gaylord Manufacturing Co. be declared illegal, and that the issue of stock to the stockholders of that company be declared illegal, and that either the stock or its equivalent in money be given to the stockholders of the Eagle Lock Company of that date. At the time of this transaction the estate of James Terry, Sen., owned four hundred and fourteen shares of the stock of the Eagle Lock Co., sixty-nine shares of which belonged to the petitioner in his own right as legatee of his father's estate. The petitioner also owned in his own right, by purchase or otherwise, forty shares of the stock on the 11th of September, 1871. The company had a surplus of $250,000 at this time, and the petitioner as administrator, and in his individual capacity, was entitled to such portion of the surplus as was represented by the stock he held September 11th, 1871. There is no evidence that when he transferred the shares which he held either for himself or as

administrator, he sold or conveyed his right to this surplus or the new stock. That right still remains, and the court is asked to enforce it. 4th. That the Eagle Lock Co. shall issue the stock voted August 5th, 1875, or else pay the petitioner its equivalent in cash. At this time the petitioner held no shares as administrator, but held one hundred and fifty shares of the stock in his own right. The new stock was distinct from the old, and any conveyance of the old stock could not carry with it any portion of the new, unless specially named. 5th. The court is also asked to grant such other remedy as the facts disclosed in the record will warrant.

*G. M. Stearns*, of Massachusetts, and *S. O. Prentice*, for the respondents.

1. The petitioner has no ground of relief against the arrangement with the Gaylord Manufacturing Co., unless it be that the transaction was *ultra vires.* Ang. & A. on Corp., § 312; Green's Brice's Ultra Vires, 555, 578; *Treadwell* v. *Salisbury Manf. Co.*, 7 Gray, 399. The committee finds that the transaction was one of perfect good faith, and not unprofitable or injurious to the interests of the Eagle Lock Co. or to the petitioner as a stockholder thereof. If it was not *ultra vires*, and was honestly entered into, the majority of the corporation had full power to enter into it, even against the will of the minority. If the petitioner complains that some other plan would have been better, we answer that this court has no power to hear his complaint. Ang. & A. on Corp., § 393; *Eggleston* v. *Doolittle*, 33 Conn., 396, 402; *In re St. Mary's Church*, 7 Serg. & R., 517.

2. Was the transaction *ultra vires?* The Eagle Lock Co. had full power to purchase all of the property of the Gaylord Co., there being no restraining clause in its charter or in the statutes of Massachusetts, where the property is located. The capacity to sell and purchase was complete. Green's Brice's Ultra Vires, 102, 103, and note; *Page* v. *Heineberg*, 40 Verm., 85; *Treadwell* v. *Salisbury Manf. Co.*, 7 Gray, 393, 404; *Heirs of Reynolds* v. *Commissioners of Stark County*, 5 Ohio, 206. The Eagle Lock Co. could make payment in its

own shares. *Treadwell* v. *Salisbury Manf. Co.*, supra. Had it therefore taken the transfer of the property to itself, or to trustees for itself, there could clearly be no ground for the relief sought. It however, acting under advice and for reasons of expediency which seemed sufficient, gave the transaction the form which it took. We submit that the course chosen was clearly within its powers. There is no general prohibition against a corporation owning and holding the stock of other corporations. It is a matter of common practice with many classes of corporations, as banks, insurance companies, &c. Nor is there any general prohibition against manufacturing corporations owning stock. They may under certain circumstances, and for certain purposes, and may not under other circumstances and for other purposes. In other words, the question of *ultra vires* in any given case is one which grows, not out of the nature of a corporation, but out of the particular circumstances of the case, and of the needs and exigencies of the corporation in question. Certain principles, hovever, should be borne in mind. A corporation is a legal existence devised that an aggregation of individuals may transact business and hold property free from certain restraints which would otherwise exist. Its essential object is not a restraining, but an enabling one. *Dartmouth College* v. *Woodward*, 4 Wheat., 636; *Smith* v. *Hurd*, 12 Met., 381, 384. And corporations may exercise all the powers within the fair intent and purpose of their creation, which are reasonably proper to give effect to the powers expressly granted. In doing this they must have a choice of means adapted to ends and are not to be confined to any one mode of operation. *Bridgeport* v. *Housatonic R. R. Co.*, 15 Conn., 502. The general scope of a corporation is restricted, not the methods of its efficient management. Green's Brice's Ultra Vires, 66, 72. It follows from these principles that all corporations without express power may purchase and hold lands and chattels. It is incidental to their existence that they should. 2 Kent Com., 335. So also may banks, insurance companies, colleges, &c., without express powers purchase and hold stocks and bonds. It is a natural and essential branch of their business. Ang.

& A. on Corp., § 158; *Mann* v. *Eckford's Exrs.*, 15 Wend., 502. So also may manufacturing corporations purchase even their own stock under certain circumstances. It is often very advantageous that they should. Green's Brice's Ultra Vires, 99, note; Ang. & A. on Corp., § 159; *Ex Parte Holmes*, 5 Cow., 434; *Barton* v. *Plank Road Co.*, 17 Barb., 397. From the same principles it follows as inevitably that a manufacturing corporation may own stocks of kindred corporations to just the extent necessitated by its best interests, welfare, and growth in the line of its business. It may not deal in stocks of indiscriminate corporations. It may not become a speculator in the stock market. It may not hold stocks as an investment pure and simple. But it may hold stock whenever and wherever its legitimate business interests demand it, in other words when it is incidental to its legitimate purposes. To these ends the incidental powers of a corporation are complete and co-extensive with those of a natural person. *Barry* v. *Merchant's Exchange Co.*, 1 Sandf. Ch., 280; *Madison &c. Plank Road Co.* v. *Watertown &c. Plank Road Co.*, 5 Wisc., 173; *Hamilton* v. *Lycoming Ins. Co.*, 5 Penn. S. R., 339; also cases before cited. To hold that a corporation could not so act would be to seriously limit its efficiency and would put it at a great disadvantage in competition with individuals. Such is not the policy of the law. The law of self-preservation and self-protection is at the basis of the power we contend for. It should perhaps be here remarked that the purchase of the stock, although of all the stock, was not a purchase of the franchise. It is admitted that one corporation may not purchase the franchise of another. But the owner of the stock of a corporation does not own the franchise. A share of the stock does not carry with it its proportion of the franchise or property. It simply represents the relation of the share-owner to the corporate creation, and the right of the holder to his share of the profits. Ang. & A. on Corp., §§ 557, 773; *Pratt* v. *Bacon*, 10 Pick., 123; *Russell* v. *M'Lellan*, 14 Pick., 63. The Gaylord Co. still retained its corporate existence, and was bound by all its duties, liabilities, and restrictions. *Wilde* v. *Jenkins*, 4 Paige, 481. This

view of the matter obviates the necessity of considering what would otherwise be an interesting question, as to whether, under the modified policy of our laws which make the formation of a corporation not a special privilege, but a right open to any three persons of their own volition, the whole reason for the non-alienability of a corporate franchise,—especially that of a joint stock corporation,—is not taken away, and there should not be a corresponding modification in the old common law rule. Green's Brice's Ultra Vires, 104, note.

3. The petitioner prays for distribution to him of his *pro rata* share of the new stock created for the Gaylord purchase or for payment to him of its value. This claim is necessarily made upon one of two grounds:—that upon the increase of the stock of a corporation the then stockholders have the right in any event to take their *pro rata* share, or that the stock then created, being used for an improper purpose, remains in contemplation of law still in the hands of the corporation undistributed, and that the petitioner is therefore entitled to his share. The first doctrine is indeed found in some of the books, growing out of *Gray* v. *Portland Bank*, 3 Mass., 364. But we submit that it is not settled or sound law, and has never been adopted in this state. The reasoning in the case is radically false. Its argument is upon false premises, to wit, that a corporation is a contract, not a creation of the legislature, and upon that argument its conclusions are reached. This view of a corporation was afterwards repudiated in Massachusetts as elsewhere. *Pratt* v. *Bacon*, 10 Pick., 123; *M'Lellan* v. *Russell*, 14 id., 63. Other cases have taken the correct view of the nature of a corporation and have held that a stockholder has no such right. *Ohio Ins. Co.* v. *Nunnemacher*, 15 Ind., 294; *Curry* v. *Scott*, 54 Penn. S. R., 270. The stock is not undistributed stock. That the issue was a good issue the petitioner must of course admit, for his claim presupposes that. It has been paid out to third parties in a *bonâ fide* transaction, and is now in their hands, and in their hands it is good. To say that the Eagle Lock Co. has not realized from the transaction all it intended, or any thing at all, as the petitioner claims, is no objection to the validity of

the stock. The present holders are *bonâ fide* owners of properly issued stock. That the Eagle Lock Co. has received something from the transaction cannot be disputed. How then is there a failure of consideration? A partial failure would not revest the stock, or place the company in a position to recover it. The stock has gone from its hand forever and irrevocably. A decree to distribute would be ridiculous, for there is none of the stock in the hands of any of the parties to the bill. They cannot get it. This court cannot give it to them. *Dean* v. *Mason*, 4 Conn., 428. Were further objections necessary it is found in the fact that this stock has largely been resold. Third parties, purchasers in good faith and without notice, now hold it. In their hands it is clearly good and held by an indisputable title. *Hall* v. *Hale*, 8 Conn., 336. The stock was created for a special purpose. That purpose failing, as the petitioner would have it, no part of it would pass to the petitioner, even were it still in the company's hands. The creation of the stock contemplates no such disposition. And the petitioner is not entitled to equitable relief in any event or in any form, having adequate remedy at law by an action on the case, as well as by mandamus against the officers and directors of the company.

4. The petitioner asks that the Eagle Lock Co. be required to take a conveyance of all the property of the Gaylord Co. in order that it may obtain the full benefit of its purchase. But there is nothing to be gained by such a course. While the arrangement as consummated does not vest the *legal title* of the Gaylord property in the Eagle Lock Co., it gives the full and unrestrained control, management and disposition of it, together with more convenient and efficient means of utilizing it. And the course pursued was chosen by the stockholders and officers after deliberation, and upon advice, as best adapted to conserve the interests of the company. This court will not interfere to change the nature of the arrangement upon the simple ground that some other mode would have been preferable. Courts do not assume the position of a general board of direction over all the corporations within their jurisdiction. Green's Brice's Ultra Vires, 554, note;

*Treadwell* v. *Salisbury Manf. Co.*, 7 Gray, 393; *Eggleston* v. *Doolittle*, 33 Conn., 396, 402. The act was the act of the stockholders relating to their internal affairs, concerning which they had full power. But the petitioner has no proper standing in court in view of the nature of his claim. The corporation is the proper party petitioner in an action to compel the directors to secure the transfer. *Allen* v. *Curtis*, 26 Conn., 456; *Hodges* v. *N. England Screw Co.*, 1 R. Isl. 347; *Memphis* v. *Dean*, 8 Wall., 64.

5. As to the stock claimed to have been created at the meeting of August 5th, 1875. The petitioner asks that his *pro rata* share be distributed to him, or the value thereof paid. We answer that no stock was in legal existence at the time of the bringing of the petition which was created or attempted to be created by vote of August 5th, 1875. There is no proof that the statutory prerequisites of a legal stock increase were complied with, particularly as to notice to stockholders, as required. Revision of 1875, p. 310, § 4; *Stow* v. *Wyse*, 7 Conn., 219. No notice of the increase was filed with the town clerk, as by law provided.

6. The petitioner prays that the Eagle Lock Co. be commanded to desist from the manufacture of swords through the Gaylord Co. But the former company is not manufacturing swords, and has no connection with such manufacture. It is the Gaylord Co. simply and distinctly which is carrying on that business, as it may have done ever since its organization, and as it is clearly empowered to do. Under the existing arrangement the Gaylord Co. is as much a distinct organization as it ever was, exercising and having the power to exercise all its corporate powers, and amenable to the state of Massachusetts for its conduct. Its powers are not affected or restricted by any limitations which may exist in the powers of the owners of its stock. *Wilde* v. *Jenkins*, 4 Paige, 481. But if the manufacture is the act of the Eagle Lock Co. it is not *ultra vires*, and, being a profitable undertaking, it cannot be otherwise complained of. "Corporations may so far develop and extend their operations as to engage in matters not primarily contemplated by their founders." Green's Brice's Ultra Vires, 90.

7. As affecting the right of the petitioner generally to the relief sought, we observe—(1) That all the parties whose interests arc involved and whose rights are at stake, are not in court and have had no opportunity to be heard. Courts of equity will not proceed to decree until all parties in interest are before the court, however numerous they may be. Calvert on Parties, 1 to 11; Story Eq. Pl., § 72. (2) The petitioner has by his silence acquiesced in the transactions of which he complains, by his conduct and implied assent he has waived any rights which might once have been his, and by his whole course of action and dealing has estopped himself from making the claims in his bill contained. "Courts will not entertain a bill filed on behalf of any stockholder who has acquiesced in the acts complained of." *Ffooks* v. *London & So. Western Railway Co.*, 17 Jur., 365. Lapse of time creates an equitable estoppel. Story Eq. Jur., § 1539 *a; Smallcombe's case*, Law Reps. 3 Eq. Cas., 769. Where one, by his conduct or silence, by standing by and not announcing his rights, or otherwise, induces or suffers another to come into a position where, by his subsequently asserting those rights the other will be injured, he is completely estopped from making any claim under them. Bigelow on Estoppel, 452; Story Eq. Jur., §§ 1546, 1551; *N. Haven* v. *Fair Haven &c. R. R. Co.*, 38 Conn., 422. (3) To the prayer for the distribution of stock another objection is insurmountable. The distribution is impossible for two reasons, that the stock is out of the hands and control of the parties to the bill, and that if the respondents were the holders of the stock, it could not be traced. (4) A final objection to any interference by this court is found in the fact that it is impossible to ascertain the equities in the case, to apportion and determine to what the various parties in interest are entitled, and to frame any decree which shall do justice to all concerned.

CARPENTER, J. Whatever may be said of the original power of the respondent corporation to enter into the arrangement with the Gaylord Manufacturing Company which has been stated in the finding, and whatever we might have

thought it our duty to do had we been called upon seasonably to restrain the corporation from consummating the arrangement, we are clearly of opinion that at this late day, after the contract has been executed, after the company has been permitted for the period of five years to transact business under the arrangement with the knowledge and acquiescence of the petitioner, made large profits therefrom and paid dividends of which the petitioner received his share; after parties have been permitted to buy and sell the stock upon the faith of the validity of the transaction, in which sales the petitioner himself largely participated; after the petitioner has disposed of his own stock with the exception of a single share, at the par value of $25; after it has become impossible to place the parties in *statu quo;* and more especially as many of the parties interested are not now before the court—the petitioner has no sufficient standing in court to enforce his demand.

In many instances a court of equity will refuse to interfere with a corporation at the instance of a stockholder, in respect to an unauthorized contract which has been fully executed, when if the same stockholder had applied in season for an order to restrain the execution of the contract it might have felt bound to grant the relief prayed for. And especially is this so where, as in this case, the petitioner has stood by and allowed the alleged illegal transaction to be consummated, and has allowed and even induced others to become interested in the corporation upon the supposition that the existing state of things is legal and proper. If it be conceded therefore that the transaction was originally *ultra vires*, a point we do not discuss, we should not feel justified in interfering with it at this time except for very strong reasons. Such reasons do not exist in this case. On the contrary, there are pretty cogent reasons why we should not interfere.

It nowhere appears that the transaction has been injurious to the petitioner personally. The fair inference from the record is that his stock has been worth more to him by reason of it than it would have otherwise been. He sold his stock presumptively for its full market value,—at least there is nothing to indicate that he sold it at a lower price in consid-

eration of the claim that the transaction was illegal and invalid. If he sold it for its full market value unaffected by that claim, there is a decided element of bad faith in the attempt now made to get his proportion of the new stock, or its cash value, on the basis of the stock owned by him when the new stock was created. It is difficult to see how he can receive what he now demands without injury to the other stockholders. If he receives it in stock where is it to be obtained? It is absurd to suppose that the former stockholders of the Gaylord Manufacturing Company can now be compelled to surrender their stock, even assuming that they are now the owners of it. They are not individually parties to this proceeding; and even if they were parties it is difficult to see upon what equitable principles their possession could be disturbed. They had a perfect right to sell their stock and receive in return the stock of the Eagle Lock Company; they gave a full equivalent for what they received, and acted in entire good faith. Two other sources remain—by purchase and by creation. If stock is created for the purpose the value of existing stock is thereby diminished; if stock is purchased, or the petitioner is compensated in cash, the assets of the company are thereby reduced. In any event all other stockholders suffer. It operates as a fraud upon those who purchased of the petitioner. In that respect he does not come into court with clean hands; more than that, he comes with a tainted case.

Nor is there any occasion to interfere with the method adopted for the management of the affairs of the Gaylord Manufacturing Company. That method seems to work satisfactorily to the parties interested, and secures, substantially, to the Eagle Lock Company all that was contemplated by the purchase. We see nothing legally objectionable either in the method or its results.

In respect to that clause in the bill praying that the company may be restrained from manufacturing swords through the Gaylord Manufacturing Company, it is sufficient perhaps to say that it does not appear that the company is now engaged in that business; but if otherwise, under the circum-

stance, as at present advised, we see no good reason why the Gaylord Manufacturing Company may not lawfully engage in any business permitted by its fundamental law.

The view we have taken of this branch of the case renders it unnecessary for us to consider the interesting questions relating to the doctrine of *ultra vires,* and especially the question how far that doctrine applies to trading and manufacturing corporations under our joint stock laws.

2. The second general question in this case relates to the supposed increase of stock on the 5th day of August, 1875. On that day a meeting of the stockholders of the Eagle Lock Company was held pursuant to notice, at which a vote was passed increasing the capital stock two thousand shares out of the surplus earnings of the company, which were ample for that purpose. It seems that that increase was made for a special purpose, and that that purpose soon after failed or became impracticable. Thereupon a special meeting of the stockholders was called and held on the 18th day of the same month, and before any action had been taken under the votes of August 5th, at which a vote was passed rescinding the vote increasing the stock. No stock was in fact issued, and no certificate of the increase of stock was ever filed, either with the town clerk or the secretary of the state. This state of things continued until July 26th, 1876, when this petition was brought. During that time fourteen hundred and twenty-four shares of the stock of the corporation changed hands. After this suit was brought the petitioner sold one hundred and sixty shares of his own stock, leaving himself the owner of one share only.

The petitioner now insists that he is entitled to his proportion of the supposed increase of stock on the 5th day of August, 1875, according to the number of shares owned by him on that day; or if that cannot be done, that the company be required to pay him in cash the value of his proportion of such increase.

It is very clear that the alternative prayer of the petition ought not to be granted. That would be in effect making it a cash dividend, and that the company never intended. It

would withdraw from the working funds of the company that amount, which would not have been the result had the stock dividend been carried into effect. It is in effect asking the court to make a dividend instead of enforcing one made by the company.

If the petitioner is entitled to receive anything it is stock. But we think he is not entitled to that.

The vote of the company—the first step towards converting the surplus earnings into stock—although absolute in form was nevertheless contingent in substance as understood at the time. When the contingency happened which made it undesirable to complete the process the company immediately retraced its steps, and attempted at least to restore the stock to its former condition. The first step only in the process had been taken; the subsequent steps, equally essential—the issuing of the stock and the filing of the certificates—were virtually prohibited by the rescinding vote.

But it is said that the first vote brought the stock into existence, and that the petitioner thereby acquired a vested right to his *pro rata* share of it. The proceeding is likened to a cash dividend, and the case of *Beers* v. *Bridgeport Spring Co.*, 42 Conn., 17, is cited.

There is a difference however between a cash and a stock dividend. The former is created by a simple vote of the directors, and the amount thereby becomes severed from the general fund and belongs to the stockholders *pro rata*. The latter can be initiated only by a vote of the stockholders. That is followed by issuing the stock, and the increase can only be completed legally by filing with the town clerk and with the secretary of the state the certificates required by law. Suppose the vote had been to increase not from the surplus earnings but by a sale of the newly created stock. In such a case it cannot be said that the capital is actually increased until the new stock is subscribed for at least. Until then there is an element of uncertainty about it. It may never be taken. It is very clear that the vote to increase is not *per se* an increase. Nor is it such where the increase contemplated is from the surplus earnings.

Again—a cash dividend entitles the stockholder to so much money, the ordinary way in which he receives from time to time the fruits of his investment. Such dividends do not materially affect the value of the stock. A stock dividend is exceptional. It does not add to his ready cash, but it changes the form of his investment by increasing his number of shares, thereby diminishing the value of each share, leaving the aggregate value of all his stock substantially the same. It is of no special importance whether that value be divided into few or many shares.

These differences are somewhat material, and serve to show that the petitioner's right, if he has such a right, to an increase of the number of his shares, was at the time a mere nominal right, and one which possessed no appreciable pecuniary value. It is at least doubtful whether a court of equity will in any case aid in enforcing such a right. But however this may be, there are other reasons of a pretty substantial character why the prayer of the petition should not be granted.

The petitioner's right, as we have seen, was a mere naked right which he might waive without losing anything, and might enforce, if it could be enforced, without gaining anything. It became a mere question of expediency—shall the surplus be actually converted into capital, or remain surplus and be used as capital? The corporation chose the latter; and the petitioner, having nothing to gain or lose in either case, acquiesced in that decision. Instead of proceeding at once to enforce the vote of August 5th, he remained quiet for nearly one year, allowing the company to continue business and the stockholders to buy and sell stock upon the supposition that there was no increase. During that time fourteen hundred and twenty-four shares of the stock changed hands upon the basis of $150,000 capital instead of $200,000. Each person selling received his full share of the surplus in the enhanced value of the stock sold; and each person purchasing paid for the surplus in proportion to the number of shares purchased. If now the law is so that the surplus can be converted into stock under the vote of August 5th, 1875, for

the benefit of the then stockholders, it is apparent that those who have sold their stock will receive double their proportion of the surplus, while those who purchased, and thereby purchased and paid for a proportional interest in the surplus, will fail to realize what they purchased. A court of equity cannot be expected to pass a decree which will result in consequences so inequitable and unjust.

What is here said of third persons applies with equal or greater force to the petitioner himself. The only difference is that he sold his stock after the suit was brought; but that difference does not operate to the petitioner's advantage, for he had full knowledge of the existence of the suit and the purchasers had not. Presumptively, for the finding shows nothing to the contrary, he received the full market value of his stock. If so, he is now asking a court of equity to assist him in reducing the value of the stock which he sold twenty-five per cent. for his own benefit. He does not ask simply that he may be permitted to perpetrate a fraud, but he asks a court of equity to assist him in doing it. That cannot be done.

The Superior Court is advised to dismiss the bill.

In this opinion LOOMIS and GRANGER, JS., concurred; PARK, C. J., and PARDEE, J., were of opinion that the respondent corporation had no right to revoke the stock dividend which was voted on the 5th of August, 1875, but otherwise concurred; the former however expressing a doubt whether the transaction of September 11th, 1871, between the respondent corporation and the Gaylord Manufacturing Company could be sustained.