The Atchison, Topeka & Santa Fé Railroad Company, Isaac T. Burr, et al., v. John W. Fletcher.

1. CORPORATION—*Powers.* A corporation is clothed everywhere with the powers given by its charter, and has the capacity to carry on its business and extend its operations in other states and countries, so long as it does not depart from the terms of the charter under which it was created.

2. ———— *Additional Powers.* Additional powers, auxiliary to the original design or purpose of a corporation, may be conferred thereon by the legislature of the state where the corporation is created.

3. BONDS, *Binding Guaranty of; Innocent Holder.* Under the provisions of the charter of the Atchison, Topeka & Santa Fé Railroad Company of February 11, 1859, and the terms of the statutes of Kansas, if such company guarantees a bond or other negotiable instrument and takes the same as its own and sells it, its guarantee will be binding upon the company in the hands of an innocent holder for value and without notice of the origin of its title, even if the guarantee of that particular bond, or other negotiable instrument, when made, was *ultra vires* in that special instance.

4. LEASE *by Railway Company of Road of Another Company.* Any railway company organized under the laws of this state may lease the road and appurtenances of any other railway company, when the road so leased shall thereby become, in the operation thereof, a continuation and extension of the road of the company accepting the lease.

5. EXTENSION *of Railroad by Lease of Other Roads.* Under its charter and the statutes of the state, the Atchison, Topeka & Santa Fé Railroad Company can not only lease a Colorado railroad, but can also lease roads in New Mexico, Arizona, and Old Mexico, if each road so leased thereby becomes, in the operation thereof, a continuation and extension of the road of the Atchison company.

6. AUTHORITY *to Accept Stock and Guarantee Bonds.* Upon the facts disclosed in this case, the Atchison, Topeka & Santa Fé Railroad Company, under its charter and the statutes of the state, had authority to accept the stock of the Sonora Railway Company, of Mexico, and guarantee its mortgage bonds.

7. INJUNCTION—*When Granted, When Not; Notice.* The statute expressly provides, if a court or judge deem it proper that the defendant, or any party to the suit, shall be heard before granting a temporary injunction prayed for, that reasonable notice may be given to such party, and in the meantime a restraining order may be issued; therefore, a court or judge should never grant a temporary injunction in

an action involving large pecuniary interests, or other important matters, without notice, where the party to be affected thereby can be readily notified, except in case of extreme emergency. The hasty and improvident granting of temporary injunctions, without notice, is not in accordance with a fair and orderly administration of justice.

*Error from Wyandotte District Court.*

ACTION brought on December 16, 1885, by *John W. Fletcher* against *The Atchison, Topeka & Santa Fé Railroad Company, Isaac T. Burr* and others, for the purpose, among other things, of canceling a certain contract between the aforesaid railroad company and the Sonora Railway Company, to discharge the Atchison company from all liability in respect to the guaranty in said contract, and to enjoin the directors and agents of the Atchison company from any further payment of interest on the bonds of the Sonora company. The district judge in vacation granted a preliminary injunction as prayed for. The Atchison company has brought the case to this court for review. The material facts are stated in the opinion.

*Geo. W. McCrary*, and *James Hagerman*, for plaintiff in error, The A. T. & S. F. Rld. Co.

*Geo. R. Peck*, for the holders of the bonds of the Sonora Railway Company.

*Henry M. Cheever*, and *Waters & Chase*, for defendant in error.

The opinion of the court was delivered by

HORTON, C. J.: The facts in this case, as they appear from the record, are substantially these: The legislative assembly of the territory of Kansas incorporated, in 1859, "The Atchison & Topeka Railroad Company." The company was authorized to survey, construct and operate a railroad, with one or more tracks, from Atchison, on the Missouri river, to Topeka, and to such point on the southern or western boundary of the territory, in the direction of Santa Fé, New Mexico, as might be most convenient and suitable for the construction

of the road; and it was also authorized to build a branch of the road to any point on the southern boundary of the territory of Kansas in the direction of the gulf of Mexico. On November 26, 1863, the name of the company was changed to "The Atchison, Topeka & Santa Fé Railroad Company." After its organization the company proceeded to build its line of railroad, so that it was put in operation from Topeka to Newton, April 15, 1872; from Newton to Dodge City, September 15, 1872; and from Dodge City to the western boundary of the state, in the direction of Santa Fé, New Mexico, January 1, 1873 — making a distance altogether of over 470 miles. From the terminus of the railroad on the western boundary of Kansas to the boundary line between Colorado and New Mexico, the Pueblo & Arkansas Valley Railroad Company built a line of railway, and completed the same on July 10, 1879, a distance of about one hundred and seventy miles. From the terminus of the Pueblo & Arkansas Valley Railroad to San Marcial, N. M., the New Mexico & Southern Pacific Railroad Company built a line of railway, a distance of over 353 miles, which was put in operation October 1, 1880. From San Marcial to Deming, a point on the Southern Pacific Railroad, distant from San Marcial a little over 129 miles, the Rio Grande, Mexico & Pacific Railroad Company built a road, which was finished March 20, 1881. The Sonora Railway Company Limited is a corporation organized to build and operate a railway from the boundary line between the United States and Mexico to Guaymas, on the Gulf of California, 262 miles in length. In 1881 this company had completed only ninety miles of its railway from Guaymas, extending in a northerly direction toward the said boundary line. It was the intention of the directors of the Atchison company to build an independent road from Deming to the Mexican boundary to connect with the Sonora road, but in 1881, a satisfactory proposal having been made by the Southern Pacific Railroad Company for the joint use of so much of its track as might be required, an agreement was made between the two companies, subject to termination by either party giving two years'

notice to the other, by which the Atchison company was permitted to run its trains, with the same rights as the Southern Pacific trains, over the Southern Pacific road from Deming to Benson, a distance of 174 miles. From Benson the Atchison company built a road called the New Mexico & Arizona Railroad, about 97 miles long, to connect with the Sonora road at or near Los Nogales, on the Mexican border. The Sonora Railway, extending from Guaymas to Nogales, was completed on November 25, 1882. In 1881 the directors of the Atchison company entered into a contract with the Sonora company by which the capital stock of the Sonora company, amounting to $5,248,000, was transferred to the Atchison company in consideration of the issuance and delivery of $2,700,000 of the capital stock of the Atchison company to the Sonora company and the guarantee by the Atchison company of the interest, at seven per cent. per annum, of $5,240,000 of the first-mortgage bonds of the Sonora company. Of the bonds so guaranteed, $4,050,000 have been marketed, and $1,190,000 of the bonds are in the treasury of the Atchison company. Ever since the purchase of the Sonora stock and the guarantee of the interest on its bonds by the Atchison company, the Sonora road has been operated by the Atchison company, and its expenses have been borne by that company. The annual interest on the bonds of the Sonora company, so guaranteed by the Atchison company, amounts to the sum of $283,500 a year, and is payable in July and January of each year.

On December 16, 1885, John W. Fletcher, of the city of Detroit, Michigan, claiming to be the owner of 200 shares of the capital stock of the Atchison company, of the value of $17,000, commenced this action in the district court of Wyandotte county, in this state, for the purpose, among other things, of canceling the contract between the Atchison company and the Sonora company by which the Atchison company agreed to guarantee the interest on its bonds; to discharge the Atchison company from all liability in respect to the guarantee; and to enjoin the directors and agents of the Atchison company from any further payment of interest on the bonds.

The petition was presented to the district judge in vacation, who, without notice to defendants, or either of them, granted a preliminary injunction as prayed for, against the Atchison company, its directors, officers and agents, from paying any interest on the bonds of the Sonora company. The amount of the undertaking fixed by the district judge upon allowing the injunction was $1,000 only. The Atchison company subsequently appeared before the judge and excepted to his ruling, and at once brought the case to this court upon petition in error, for the purpose of raising the question, whether the injunction was properly granted.

The most important inquiry is, whether the petition, taking all of its allegations to be true, shows that the contract of guarantee complained of was *ultra vires*. Upon the part of plaintiff below, it is contended that this contract was entirely unauthorized by the charter of the Atchison company, and beyond the power of the directors of that company to consent to or to execute, and therefore wholly void and of no binding force upon the corporation or its stockholders. On the part of defendants, the claim is that under the powers conferred upon the Atchison company by its charter, the subsequent legislation of this state, and the general principles of law applicable to corporations, the contract was and is valid in every respect.

The petition alleges that during the years 1882, 3–4 and 5, the operating expenses have been greater than the earnings, and but for the guarantee of the Atchison company, that the Sonora bonds would be worthless. The petition further alleges that if the Atchison company continues to operate the Sonora road and keeps the guarantee of its bonds good, it will be at the cost of the depletion of its treasury, and will render the dividends upon its stock less in amount than they otherwise would be. The question before us, however, is one of power. If the Atchison company had the authority to accept the stock of the Sonora company and guarantee its mortgage bonds, it is liable on the guarantee, whether the Sonora road be a sucker, sapping the very life of the Atchison

company as a consumer of its earnings, or a feeder, filling to overflowing a plethoric treasury. Common honesty will forbid a corporation, as it will a private individual, from evading the terms of a contract upon the ground merely that it has been unexpectedly expensive, and therefore not remunerative. In this connection, perhaps, it should be said that the directors of the Atchison company still insist that the contract with the Sonora company will prove very desirable and profitable in the end. They go farther, and say that the Atchison company and its stockholders have already received benefits from the contract by the acquisition of connecting roads and the extension of their line, so as to make a through route, which was absolutely necessary to the financial success of their company, and that thereby the earnings and profits of the line, as a whole, have been largely augmented. As to the wisdom or expediency of the execution of the contract between the Atchison and Sonora companies as an original proposition, we have nothing to do. Whether the contract between these companies be a productive or an unfortunate one for the Atchison company, is immaterial to our determination of this case. The question with us is, whether the contract was within the scope of the powers of the Atchison company to execute or perform, under any circumstances or for any purpose—not whether the Atchison company made a good or bad bargain.

Notwithstanding the terms of the charter of the Atchison company, the various provisions of the statute, and the unwritten law of comity that a corporation will be recognized and permitted to prosecute its lawful enterprises in every state which has not expressly refused its consent, the senior counsel representing the plaintiff insists that the Atchison company has no legal right by purchase, lease, or other arrangement, to operate its road or run its cars as part of its own system beyond the territorial limits of Kansas. The proposition of another counsel representing the plaintiff is, that while the Atchison company is not confined exclusively to the limits of the state, yet, that the road beyond the New Mexico line is operated with-

out legal authority.   Very able arguments were presented by
the several counsel upon the hearing of the case, and very elab-
orate briefs have been filed with us.   We have given all of
these careful attention and examination, and have reached the
conclusion, after much deliberation of the serious matters in-
volved, that the proposition asserted by counsel of plaintiff
limiting the power of the Atchison company in its operations
wholly to the state of Kansas, or to adjoining states, is unsound
and receives no support in the sections of the statute cited, or
in the authorities controlling.   The petition assumes that the
acquirement by the Atchison company of the intermediate links
between the Kansas line and the Sonora line was unauthorized,
but the allegations are indefinite as to the actual relations ex-
isting between these intermediate links and the Atchison com-
pany.   We think, however, it is sufficiently shown that the
Atchison company is operating its line of road from Atchison
and Kansas City to connect with the Sonora road at Nogales,
on the Mexican border.   It is a general rule that the allegations
of a pleader shall be taken most strongly against himself, and
therefore we are not to assume that the directors of the Atchi-
son company, in their arrangements for operating their line
from Kansas to Mexico, are acting contrary to the purposes
for which the corporation was created.   The presumptions are,
in the absence of allegations of facts to the contrary, that the
Atchison company is acting under and in accordance with the
provisions of its charter and the statutes conferring authority
upon it. (*A. T. & S. F. Rld. Co. v. Davis*, 34 Kas. 209.)

It is a general rule that the corporations of one state will be
permitted to carry on their business and extend their operations
in other states and countries, so long as they do not depart
from the terms of the charters under which they were orig-
inally created.   Under the comity of states, or rather, we
should say, under the comity of nations, the Atchison com-
pany can exercise all the powers granted by its charter in
Sonora or in the other states of Mexico, as well as it can in
Missouri, Colorado, or New Mexico, if its powers thus exer-
cised are not repugnant to or prejudicial to the interests or

laws of Mexico; therefore, that the Sonora road is in a foreign country does not, we think, affect the case. In fact, a corporation is clothed everywhere with the character given by its charter, and the capacity of corporations to make contracts beyond the states of their creation, and the exercise of that capacity, are supported by uniform, universal and long-continued practice. (*Land Grant Rly. Co. v. Comm'rs of Coffey County*, 6 Kas. 245; *O'Brien v. Wetherell*, 14 id. 616; *Bank of Augusta v. Earle*, 13 Pet. 519; *Cowell v. Spring Co.*, 100 U. S. 55.) Hundreds of corporations are created, not strictly local in their character, as in the instance of banks and insurance companies, all of which transact business in all sections of the country. To illustrate the frequency with which corporations exercise great powers in foreign countries, counsel for defendants, upon the argument, cited the East India Company, chartered in England, but doing business throughout the East Indies; the Pacific Mail Steamship Company, a New' York corporation, operating a line of steamers from New York city *via* Panama to San Francisco; the Western Union Telegraph Company, a New York corporation, having its offices in almost every city of the Union; the Maxwell Land Company, a Netherlands corporation, owning vast estates in New Mexico; and it was asserted by the same counsel that the Sonora company, alleged in the petition to be a Mexican corporation, is in fact a corporation created under the laws of Massachusetts. We may also refer, among many others that might be named, to the following corporations: The Colt's Patent Fire Arms Manufacturing Company, although an American-corporation, trades extensively in England; the Liverpool, London & Globe Insurance Company, the Royal Insurance Company, the Sun Fire Insurance Company (limited), the Phœnix Assurance Company, of London, are all English corporations, but they transact business in many states of the Union; the North British and American Insurance Company, the Norwich Union Fire Insurance Society, and the Queen Insurance Company, and other English corporations, write risks in Kansas; the

1. Character and powers of corporation.

Western Assurance Company is a Canadian corporation, accepting fire risks in this state; the Panama Railroad Company was incorporated in New York, and built a road across the isthmus of Panama; the Wells-Fargo Express Company, one of the greatest of the common carriers, is a Colorado corporation. It is a matter of general knowledge that many cattle companies recently chartered in England, now transact business, involving millions of dollars, in the western territories.

It is well settled that a railway corporation may contract to carry beyond the terminus of its own line, and such a contract will be valid, although requiring transportation in another state or country. (*Mo. Pac. Rly. Co. v. Beeson*, 30 Kas. 298; Hutchinson on Carriers, §§ 144, 152.) The Narragansett Steamship Company was and perhaps is now a common carrier between New York and Fall River; it receipted for a trunk to be delivered at Boston; the trunk failed to reach its destination, and in an action against the company by the owner for its value it was decided that the company was bound to carry the trunk to Boston, the same as if its vessels went to that city, and was therefore liable for the loss. (*Berg v. Steamship Co.*, 5 Daly [N. Y.] 394.) And the weight of authority is, that a railway company, deriving its powers to engage in business from its charter, which by the very terms thereof is limited to the road between certain designated points, can bind itself as a common carrier beyond its designated line. (*Perkins v. Railroad Co.*, 47 Me. 573; *Bissell v. Railroad Co.*, 22 N. Y. 258; Hutchinson on Carriers, § 153, and cases cited.) If railway corporations may contract for the transportation of freight and passengers in other states, and beyond their chartered *termini*, why may not such a company convey, in its own cars and trains, freight and passengers over connecting and continuous lines in other states, if it can make arrangements with such connecting and continuous lines so to do?

It is the necessary deduction from the principles announced in the foregoing decisions, that if the Atchison company is empowered by its charter and the statutes of Kansas to lease or by any other arrangement to run its cars outside of the state,

it can exercise that power everywhere — and as well in Mexico as in Colorado or Arizona.

This brings us to the construction of the charter of the Atchison company, and the legislation of the state conferring rights and powers upon railroad corporations. In interpreting the powers possessed by a corporation, we must look to the intention of the legislature in the enactment of the statute. It is manifest the legislative assembly of the territory of Kansas, in granting the charter to the Atchison company, anticipated that some day the road would become a part of a transcontinental line, and thereby that Kansas, by reason of its geographical location, would have passing over it the great traffic of the country, east and west, north and south, because it provided for building its road in the direction of Santa Fe, and also of the gulf of Mexico.

Section one of said charter reads:

"That C. K. Holliday, Luther C. Challiss, Peter T. Abell, . . . with such other persons as may associate with them for that purpose, are hereby incorporated, a body politic and corporate, by the name of the Atchison & Topeka Railroad Company; and under that name and style shall be capable of suing and being sued, impleading and being impleaded, defending and being defended against, in law and equity, in all courts and places; may make and use a common seal and alter or renew the same; be capable of contracting and being contracted with; and are hereby invested with all powers and privileges, immunities and franchises, and of acquiring by purchase or otherwise, and of holding and conveying real and personal estate, which may be needful to carry into effect fully the purposes and objects of this act."

Section 20 of said charter gives express authority—

"To make such contracts and arrangements with other railroads which connect with or intersect the same, as might be mutually agreed upon by the parties, for leasing or running their roads, or any part thereof, in connection with roads in other states, and to consolidate their property and stock with each other; . . . and to have all the powers, privileges and liabilities that they may hold by their several charters."

Then, the additional authority was granted by the first and

second sections of ch. 92, Laws of 1870, whereby the Atchison company could consolidate with a connecting road and a company of this or an adjoining state could lease the road of the Atchison company.   The limitations in these sections providing for consolidation and extension were, that the lines of the road consolidated should, when completed, form a continuous line of railroad, and when a company leased its road to another railroad company, the line of the road should so connect with the leased road as to form a continuous line.   We think a fair construction of § 3 of that act to be that any rail-

4. Lease by railway company of road of another company.

road company may lease its road and appurtenances to any Kansas company, when the road so leased shall thereby become, in the operation thereof, a continuation and extension of the road of the company accepting such lease.   The section is as follows:

"That any railroad company shall have power to lease its road and appurtenances to any railway corporation organized under the laws of this state, *or of any adjoining state*, when the road so leased shall thereby become, in the operation thereof, a continuation and extension of the road of the company accepting such lease."

The only difficulty in the construction of this section arises from the words "or of any adjoining state;" but it may be that these words refer to a corporation of an adjoining state that has come into the state and leased a Kansas road, under the terms and conditions of the statute.   If, however, the legislature was inadvertently legislating in said § 3 for a railroad company of another state to lease a road not touching Kansas, we do not think this would vary the construction we have given to the other portions of the section.   In the second section, the law allows the road of an adjoining state to come in and lease a Kansas road, and a Kansas company to lease the road of another Kansas company; and then the broad authority is given in § 3 for any railway company organized under the laws of this state to lease the road and appurtenances of any other railway corporation, when the road so leased shall thereby become, in the operation thereof, a continuation

and extension of the road of the company accepting such lease. If § 3 was intended merely to give a Kansas railroad company the power to lease another Kansas railroad, it is but a repetition of said § 2, and the whole of said section is meaningless and useless; but if the section be given the interpretation as stated, it has full force and operation, and permits any Kansas railroad company to lease any other railway, whether in or out of the state, when the road so leased shall thereby become, in the operation thereof, a continuation of the Kansas company.

In 1873, the legislature passed a further act, which reads:

"That it shall be lawful for any railroad company created by or existing under the laws of this state, from time to time, to purchase and hold stock and bonds, or either, or to guarantee the payment of the principal and interest, or either, of the bonds of any other railroad company or companies, the line of whose railroad, constructed or being constructed, connects with its own."

Under the construction we have given to its charter and the statute, the Atchison company had the right to lease the road and appurtenances of any railway company **5. Extension of railroad by lease of other roads.** in Colorado, New Mexico, or Arizona, or elsewhere, when the road so leased, in the operation thereof, formed a continuation or extension of the Atchison road. Under this power, we think the Atchison company not only could lease a Colorado road, which is conceded by one of the counsel of plaintiff, but could go on and lease all the intermediate links between Kansas and Mexico; and when it came to the border of Mexico, it could also lease the Sonora road. Each road so leased would form, within the terms of the statute, in the operation thereof, a continuation and extension of the Atchison road. Having all this power, then clearly, under its charter and the laws of 1870 and 1873, the Atchison company had full authority to purchase and hold the stock and bonds of the Sonora company, and **6. Authority to accept stock and guarantee bonds.** to guarantee the payment of the interest of the bonds of that company, because the line of that road, as constructed, connects with its own. There is no

force in the proposition that there is a missing link between Deming and Benson, a distance of about 174 miles, and therefore that the Atchison road does not continue and extend *via* the New Mexico & Arizona Railroad to the Sonora Railway at Nogales. It is true the Southern Pacific built this link and may be said to be its owner, but the Atchison company has a general use thereof with the Southern Pacific, and has the same rights therein as that company. It virtually has a lease thereon, because it is in the possession of and operating it with such rights of ownership or as lessee as is necessary for all running or operating purposes. (*Van Hostrup v. Madison City,* 1 Wall. 291; *Schuyler Co. v. Thomas,* 98 U. S. 169; *Mayor v. Railroad Co.,* 21 Md. 50.)

Something has been said about the contract between the Atchison and Sonora companies being void because the Atchison company was not actually connected at Nogales at the time of the execution of the guarantee. Even if there was anything in the proposition, in view of the terms of the statute of 1873, providing for the guarantee by one railroad company of the bonds of another company, whose road *was being constructed so as to connect with its own,* we are clearly of the opinion that as to the bonds marketed and in the hands of *bona fide* holders, the contract between the companies is binding. "Where the statute confers express authority upon the company to guarantee the bonds of another company, a mere failure on the part of the guaranteeing company to pursue the mode specified in the statute, will not invalidate such guarantee in the hands of the *bona fide* holder." (Wood's Railway Law, § 188; *Arnot v. Erie Railway Co.,* 67 N. Y. 315; *Parish v. Wheeler,* 22 N. Y. 494; *Thomas v. Railroad Co.,* 101 U. S. 86; Field on Corporations, §§ 263–267; *Bradley v. Ballard,* 55 Ill. 413; Field on Ultra Vires, 185; *Town of Coloma v. Eaves,* 92 U. S. 484; *Peoria &c. Rld. Co. v. Thompson,* 7 Am. & Eng. Rld. Cases, 101, 118; *Gelpcke v. City of Dubuque,* 1 Wall. 175; *City of Lexington v. Butler,* 14 id. 282; *Supervisors v. Schenck,* 5 id. 772; *National Bank v. Globe Works,* 101 Mass. 57.) The Sonora road was com-

pleted to Nogales in 1882, and the Atchison company, having been in connection with and operating that road ever since, and having repeatedly paid interest on the Sonora bonds, has clearly ratified the contract of 1881, and therefore the guarantee of the Sonora bonds is not only valid in the hands of *bona fide* holders, but such contract of guarantee is valid for all the purposes for which it was executed.

Counsel for plaintiff object to any and to all powers granted the Atchison company subsequent to the creation of its charter in 1859, and in support thereof say that the relation between the corporation and stockholders is one of contract; that the stockholder subjects his interest to the control of the proper authorities, to accomplish the object of the organization, but does not agree that the purpose shall be changed in its character at the will of the directors or a majority of the stockholders, and that the contract between the corporation and the stockholders cannot be changed without the consent of the contracting parties by the legislature or any other authority. We concede that where the power is not reserved in the legislature to repeal or amend a charter, that so far as the charter states a compact between the corporation, it cannot be changed or repealed by the legislature; but it is settled that the legislature may authorize a body of corporators to exercise new powers or franchises without impairing those previously granted; and if the new powers can be exercised without a departure from the original contract between the corporators, there is no reason why they should not be accepted and exercised on behalf of the company by a majority of the stockholders. The special point was made in the case of *C. B. U. P. Rld. Co. v. A. T. & S. F. Rld. Co.*, 26 Kas. 669, that as the charter of the latter company made certain provisions for exercising the right of eminent domain, the company could not proceed to exercise that right under the general railroad law. It was held that it could, and that the general law applied to all corporations. We said in that case: "If a company had no right of eminent domain given by its special charter, the state legislature could,

2. Additional powers to corporation.

by general law, endow it with such right; and if it had the right, the legislature could, by a similar law, enlarge its modes of proceeding." All the legislation of the state that we have referred to is in harmony with the terms and provisions of the charter of the Atchison company. Therefore no franchises are diminished, no contract impaired. At most its powers are enlarged to carry out successfully the object of its incorporation. So to speak, auxiliary powers are added, but its charter not violated, or the benefits thereby granted infringed. (*Clearwater v. Meredith*, 1 Wall. 25; *Sprigg v. Telegraph Co.*, 46 Md. 67; Green's Brice's Ultra Vires, 80, 84; *Fry v. Railroad Co.*, 2 Metc. [Ky.] 314.) For many purposes, the Atchison company can receive, in the transaction of its legitimate business in this state, bonds and other negotiable paper; and having received such negotiable instruments, it may sell and dispose of the same; and in selling and disposing of the same, it may guarantee that they are genuine, and it may also guarantee the payment thereof.

*3. Binding guaranty of bonds; innocent holder.*

Therefore, if the Atchison company had no authority under its charter and the statutes to run its cars through Colorado, New Mexico, Arizona and Sonora to the gulf of California, and was wholly confined to the transaction of its business within the territorial limits of the state, we think, within the power conferred by its charter, its guarantee of the Sonora bonds would be binding upon the company in the hands of parties purchasing them with such guarantee in good faith and without notice. (*Pendleton v. Amy*, 13 Wall. 297; *Railroad Co. v. Howard*, 7 id. 392; *Arnot v. Erie Railway Co.*, supra; Bigelow on Estoppel, 467; 16 Am. & Eng. Rld. Cases, 488.)

As to the equities in this case, nothing is disclosed beneficial to the plaintiff. If he was a stockholder of the Atchison company in 1881, at the time of the execution of the contract of guarantee with the Sonora company, he appears before the court as a participant, watching the venture, and, if successful, willing to enjoy the fruits thereof; but as the experiment, in his opinion, has failed, he turns to the court for assistance to

repudiate its terms. If he is a recent purchaser of the stock, he ought to have known from the records of the company the terms and conditions of its contract, and hence was a purchaser with full knowledge of the guarantee of the Sonora bonds. Under such circumstances, he may be said to have purchased for the purpose of becoming a litigant, not merely to prevent a contemplated transaction, as in the case of *Du Pont v. Northern Pacific Railroad Co.*, 18 Fed. Rep. 467, but to annul a contract guaranteeing bonds, already executed, at least so far as the innocent purchasers thereof are concerned. Millions of the bonds have gone upon the market, and have passed into the hands of *bona fide* holders for value. Very cogent reasons should appear before a court of equity should interfere. They do not so appear. (High on Injunctions, § 1206; *Thompson v. Lambert*, 44 Iowa, 239; *Gregory v. Patchett*, 33 Beav. 595; *Watt's Appeal*, 78 Pa. St. 370; *Chapman v. Railroad Co.*, 6 Ohio St. 120; *Terry v. Lock Co.*, 47 Conn. 141; *Samuel v. Holladay*, 1 Wool. 400; *Goodin v. Canal Co.*, 18 Ohio St. 169.)

It was said upon the argument by counsel for plaintiff, that it is gross injustice to its stockholders for the Atchison company to plant its money or property in a foreign country. To this it may be answered: The stockholders control the company; the directors are elected or chosen by the stockholders; and it goes without saying that the stockholders, as well as the directors, should have at heart the highest interests of the company. Of course the directors must have some power to determine what is for the best interest of the company, and some discretion must always be left for them to exercise. Matters of policy and expediency, within the terms imposed by the charter and the statutes of the state, are for their consideration and determination, subject to the will of the stockholders, to whom they are responsible and by whom they are elected.

"Railroads, as all know, are things of growth. They enlarge with the development of the country." (*C. B. U. P. Rld. Co. v. A. T. & S. F. Rld. Co.*, supra.) And railroading is a

business wherein progress is absolutely necessary. A railroad cannot stand still; it must either get or give up business; it must make new combinations, open new territory, and secure new traffic, or lose its business and reduce its revenues. The directors, as well as the stockholders, must consider all of these things in their management of the affairs of such a corporation.

In concluding this part of the subject, we may say further, that the petition nowhere charges the directors of the Atchison company with incapacity, collusion, corruption, or fraud. It attacks the integrity of the system of the Atchison company beyond the limits of the state, but not the integrity of its officials.

This disposes of the case. A few words, however, concerning the action of the district judge in granting the temporary injunction. It is unnecessary to decide whether he was guilty of an abuse of judicial discretion sufficient of itself to cause a reversal of this case, but the practice of granting injunctions without notice to defendants, except in case of extreme emergency, deserves condemnation; and the granting of an injunction in such an important case as this, without notice, when it is within the general knowledge of every attorney and judge that the Atchison company has an officer or agent in every county of the state through which its road runs upon whom legal process may be served, is very censurable. The semi-annual interest upon over $4,000,000 of bonds was intended to be tied up by the order of the district judge, which bonds, according to the petition itself, have been marketed, and the holders thereof are very numerous. In addition to this, the order would naturally depreciate the value of the bonds in the markets of the world, and thus innocent purchasers thereof become the immediate and the greatest sufferers. The statute provides if a court or judge deem it proper that the defendant, or any party to the suit, should be heard before granting the injunction, it may direct a reasonable notice to be given to the party to attend for such purpose at a specific time and place, and may, in the meantime,

7. Injunction—
when to be
granted,
when not;
notice.

restrain the party. If there was ever a case where defendants should have been notified and heard before the granting of a temporary injunction, this is one. Under the statute, instead of issuing a temporary injunction in the first instance, the judge, if proper facts had been presented to him, might have issued a restraining order and directed notice to be given. The granting of a temporary injunction, under the circumstances, was not in accordance with a fair and orderly administration of justice.

The order granting the temporary injunction will be reversed, the injunction will be wholly dissolved, and the case remanded for further proceedings in accordance with the views herein expressed.

All the Justices concurring.