# SUPREME COURT,
## STATE OF KANSAS.

## JANUARY TERM, 1888.

PRESENT:

Hon. ALBERT H. HORTON, Chief Justice.
Hon. DANIEL M. VALENTINE, } Associate Justices.
Hon. WILLIAM A. JOHNSTON, }

THE HANNIBAL & ST. JOSEPH RAILROAD COMPANY v. JOHN KANALEY.

1. RAILROAD COMPANY; *Injury to Person or Property; Action, Where.* Where a railroad company, incorporated under the laws of another state, regularly runs its passenger trains into and out of a county of this state, receiving passengers at a union depot in the county for transportation over its road; and landing its passengers from its cars at such depot; and has operating arrangements to run its passenger cars over the tracks of other corporations in the county to and from such union depot: *Held,* That an action may be brought against the railroad company in the county of this state where it runs its trains and receives and lands its passengers, for any injury to persons or property upon its road. (Civil Code, §§ 50, 68a.)

2. CROSS-EXAMINATION; *Competent Questions.* In an action to recover for personal injury, brought against a railroad company, where the issue was whether the train dispatcher was negligent in giving an order to a conductor to meet another train composed of two sections, and to establish the negligence of the train dispatcher the conductor testified in his direct examination that until he saw the second section of the train he had orders to meet, he had no knowledge the said section was on the road, *held,* that upon cross-examination it was competent to ask of him if he understood the signals carried by the first section; if, with the information conveyed by those signals, he knew there was a second section following, which had the right to the road, regardless of him; if, with the signals carried, he

1 — 39 KAS.

had the right to leave the station in face of the signals; and also similar questions.

3. RAILROAD TRAINS; *Movement, How to be Directed.* The law does not require a railroad company to direct the movement of its trains by orders from the train dispatcher alone, nor by a system of signals only; nor does it require the company to adopt any particular form of orders, or any particular system for communicating them; but the company has the right to direct the movement of its trains by train orders alone, or by train orders of any form and signals, or by signals alone, or by time card alone, provided that the means adopted are brought to the knowledge of its employés, and they are reasonably well calculated to secure the safety of the men, if obeyed by them.

4. MOVEMENT OF TRAINS; *Character of Orders and Signals.* A railroad company is not required to change its orders or signals for the movement of its trains because some other railroad company has adopted a different system of orders or signals; and a railroad company may even have in use a system of orders or signals shown to be less safe than that adopted by another railroad company, without being liable to its employés for the consequences of the use of such orders or signals, if the orders and signals in use are reasonably well calculated to secure the safety of the employés of the company, if obeyed by them.

5. NEGLIGENCE, *When Not Shown.* Whether a railroad company has been guilty of negligence in the use of certain orders and signals for the movement of its trains, cannot be determined by proof that another railroad company has adopted a different order for the operation of its trains.

6. MACHINERY *to be Reasonably Safe.* Between the railroad company and its employés, the railroad company is required to exercise reasonable and ordinary care and diligence, and only such, in furnishing to its employés reasonably safe machinery and instrumentalities for the operation of its road. (*A. T. & S. F. Rld. Co. v. Wagner*, 33 Kas. 660.)

7. CONDUCTOR, *Disregarding Orders; Proper Instruction.* In an action brought by an injured employé of a railroad company to recover for personal injuries caused by a collision between two trains upon a railroad in Missouri, where the rule of the common law as to the relation of master and servant is in force, the issue was whether the collision occurred by the negligence of the train dispatcher or the conductor, who was a fellow-servant with the injured employé. Upon the trial there was evidence tending to show negligence on the part of the conductor in disregarding the signals carried by a train he was to meet; and that his train collided with the second section of another train, on account of his misunderstanding the words of a

conductor, as his train was passing. *Held*, That the railroad company was entitled to an instruction to the jury that the conductor had no right to disregard his orders and the directions conveyed to him by the signals, on account of the information he supposed he was receiving from the conductor of the meeting train.

*Error from Atchison District Court.*

ACTION by *Kanaley* against *The Railroad Company*, to recover damages for personal injuries. Judgment for the plaintiff for $5,000 was rendered on January 10, 1886. The defendant company brings the case here. The material facts are substantially stated in the opinion.

*B. F. Stringfellow*, and *Strong & Mosman*, for plaintiff in error.

*Tomlinson & Eaton*, and *Thomas P. Fenlon*, for defendant in error.

The opinion of the court was delivered by

HORTON, C. J.: In 1884, the Hannibal & St. Joseph Railroad Company — a corporation organized under the laws of the state of Missouri — operated its passenger trains to and from the union depot at Atchison; it also received and discharged passengers at the depot. The Union Depot Company owns the tracks from the bridge over the Missouri river to the depot. The Chicago & Atchison Bridge Company owns the tracks upon the bridge. The tracks of the Union Depot Company connect with the tracks of the bridge company. The Hannibal & St. Joseph Railroad Company owns one-seventh of the stock of the Union Depot Company; the employés of the depot company are paid by the company, and the company renders an account to each railroad company for its proportionate share. The railroads, as stockholders, pay back the amount of operating expenses for each month. The proportion of the expenses paid by the Hannibal & St. Joseph Railroad Company for the employés of the Union Depot Company for 1884, was one-seventh.

John Kanaley, in September, 1884, was a fireman in the

service of the Hannibal & St. Joseph Railroad Company. On the evening of September 21, 1884, two extra freight trains of that company left Brookfield, Missouri, going east to Hannibal, Missouri. These trains were designated and known by the engines pulling them as numbers 67 and 68. Homer was conductor, Gilday engineer, and Kanaley fireman on No. 67. The running of all trains upon the road was supervised and directed by a train dispatcher in connection with a system of signals in use upon the road. Homer and Gilday, the conductor and engineer of train number 67, upon leaving Brookfield received the following order from the train dispatcher at that place:

"ORDER 85.

"BROOKFIELD, Sept. 21.—*C. & E. Eng. 67 and 68:* Eng. 67 will meet No. 11 at Lingo, and and engines 57 and 51 at Macon. Engine 68 will meet No. 11 at Bucklin, and No. 57 and 51 at Macon; both running to Hannibal and avoiding other regular trains.                    [Signatures.]
2 T. S. B."

At Lingo there was a side track, and number 67 backed on this track and remained there some ten minutes or more. The first section of No. 11 passed, going west, while No. 67 was on the side track. No. 67 then pulled out, and after going about three-quarters of a mile a collision occurred at or near a place called Brush Creek, by No. 67 running into the second section of No. 11, which was following the first section of No. 11. At the time, Kanaley was shoveling coal; he dropped his shovel and jumped from the engine. He claims that he received severe personal injuries in jumping, to avoid being killed in the collision between the two freight trains. Subsequently, in an action brought by him in Atchison county, in this state, against the Hannibal & St. Joseph Railroad Company, he recovered judgment for five thousand dollars for his injuries. The railroad company complains of this judgment. First, it is contended that the trial court had no jurisdiction of the subject-matter of the action.

The statute provides:

"An action against a railroad company, or an owner of a

line of mail stages or other coaches, for any injury to persons or property upon the road or line, or upon a liability as a carrier, may be brought in any county through or into which said road or line passes." (Civil Code, § 50.)

"Every railroad company or corporation, and every stage company, doing business in the state of Kansas, or having agents doing business therein for such corporation or company, is hereby required to designate some person residing in each county into which its railroad line or stage route may or does run, or in which its business is transacted, on whom all process and notices issued by any court of record or justices of the peace of such county may be served." (Civil Code, § 68a.)

It is clearly established by the evidence that the railroad company had arrangements with the Chicago & Atchison Bridge Company, owning the tracks upon the bridge over the Missouri river; and with the Union Depot Company, owning the tracks upon the Kansas side of the river, in Atchison county, for operating purposes. It ran its passenger cars into and out of the county of Atchison, receiving and leaving passengers at the union depot, in that county; and it is immaterial whether its possession and operation of the road or tracks in that county was as owner, or as lessee. Within the meaning of the law, its road, or line, passed into Atchison county; therefore this action was properly brought in that county, and the district court of that county had full jurisdiction. (*A. T. & S. F. Rld. Co. v. Fletcher*, 35 Kas. 236.)

1. Railroad company; injury to person or property; action, where.

It is conceded in this case, as the collision occurred in Missouri and as Kanaley was injured in that state, that the rule of the common law with reference to the liability, or rather the non-liability of the master to one of his servants, for the negligence of a fellow-servant or coëmployé, prevails, and therefore that the railroad company is only liable for its own negligence, or for the negligence of some officer or agent who amounts to a vice-principal or a substitute for the company. The jury were instructed that Homer, the conductor, Gilday, the engineer, and the crew of the train drawn by engine No. 67, were fellow-servants of Kanaley, engaged in the same

common employment, and therefore that the negligence of any one of these toward Kanaley would not be the negligence of the railroad company. It is claimed, however, upon the part of Kanaley, that the collision of the freight trains near Brush creek, Missouri, on the night of the 21st of September, 1884, was caused by the negligence of the train dispatcher in failing to notify the conductor and engineer of No. 67 that there was a second section of No. 11 following; that on account of this negligence of the train dispatcher, No. 67 moved from Lingo before the second section of No. 11 passed.

On the part of the railroad company, it is contended that the collision was the direct, proximate result of the negligence of Homer, the conductor of No. 67, and a fellow-servant of Kanaley. It claims that there was a system of signals adopted and in use upon its road, by means of which its conductors, engineers and other employés were informed that trains carrying such signals have following them other trains; that No. 11 carried these signals, and thereby indicated that a second section was following as part of it, and entitled to the same rights to the track as the first section of No. 11; that Homer disregarded these signals, and therefore that the collision and injuries were the necessary consequence of his negligence. It is admitted that the dispatcher is a vice-principal or substitute for the company, and not a mere fellow-servant, in common employment with the firemen or trainmen, and therefore that if the train dispatcher was negligent, the company was also negligent. The principal question in this case is, whether the train dispatcher was negligent in giving the order that "engine 67 will meet No. 11 at Lingo, and engines 57 and 51 at Macon." Homer, the conductor, was introduced as a witness by Kanaley. His testimony was very conflicting, contradictory, and unsatisfactory. Among other things, he testified that until he saw the approaching engine and train of the second section of No. 11, he had no knowledge that that train was on the road; that he drew out from Lingo with his train because he had orders

to meet 57 at Macon, and that Macon was twenty miles distant. He also testified as follows:

"Q. Did you have any knowledge of the condition of No. 11, whether it was in two sections or not? A. Yes, sir; I did.

"Q. Why? A. Because they had a red light on.

"Q. Before you left Lingo? A. Yes, sir.

"Q. Now, having seen the red lights on them, what did they communicate to you, indicate to you? A. Indicated another train following them."

On cross-examination he testified:

"Q. How long had you known this method of signals to be in use on the road? How long had you known this system of following trains to be in use on the road? A. I think it was on the time card at the time I went there, which was six years ago. The engineer and conductor of engine 68 had the same order that I had, and they were following me."

On further cross-examination, the railroad company asked the following questions of Homer:

"Q. With the information conveyed to you by those signals, had you the right with that information alone to leave that station in the face of those signals? A. No, sir; I had not."

The court struck out the question and answer. Thereupon, the railroad company asked the following questions:

"Q. I will ask you this question: Under the information given and conveyed to you by those signals, did you know that there was a train coming into Lingo following this first No. 11, which you had no right to go out in the face of?

"Q. Did you, by the signals which you saw carried by No. 11, know that another train was immediately following No. 11, which had the right to run into Lingo, regardless of you?"

The plaintiff below objected to these questions and to any answers thereto, which was sustained by the court. Gilday, the engineer, was also introduced as a witness on the part of Kanaley. He testified, in his direct examination, that the first intimation he had of the second section of No. 11 train approaching was seeing the headlight.

Upon cross-examination, he testified:

"The engineer of No. 11 whistled five times, which was the signal prescribed by the rules to call my attention to the

fact that he was carrying red lights—that he was carrying signals for another train. This was done to draw my attention to the fact that he was carrying signals. I answered his signal of five blasts by blowing one blast on the whistle of my engine; this was to let him know that I heard his signals. These red lights conveyed to me the information that the following train had the same right to the track as the first No. 11—the same rights as the train carrying the signals; that is, they had a perfect right to the road against my train, and had the right to run to Lingo regardless of my train."

Thereupon, this question was asked of him:

"With the information conveyed to you by those signals, had you any right with that information alone to leave that station in the face of those signals? A. No, sir, I had not."

This question and answer were struck out by the court. Thereupon, the company asked the following questions:

"Q. I will ask you this question: Under the information given and conveyed to you by those signals, did you not know that there was a train coming into Lingo, following this first No. 11, which you had no right to go out in the face of?

"Q. Did you, by the signals which you saw carried by No. 11, know that another train was immediately following No. 11, which had the right to the track to run into Lingo, regardless of you?"

The plaintiff below objected to these questions as irrelevant and incompetent, and these objections were sustained. Both of these witnesses were important and material witnesses for Kanaley; they had been with the railroad company a long time; were familiar with their respective duties; understood fully the system of conveying information on the road by means of signals carried on trains; and upon cross-examination should have been permitted to answer the questions above

2. Cross-examination; competent questions. referred to; and the court erred in striking out the questions and answers above stated; and also in refusing to permit the other questions to be asked and answered. All of these questions concerned the alleged negligence of Homer, the conductor and fellow-servant of Kanaley. The direct testimony of Homer and Gilday laid the foundation for the questions propounded.

The court also erred in refusing to permit the railroad company to show that at the time Homer received his written orders from the train dispatcher, the train dispatcher verbally said to him that there was a second section of No. 11 following immediately after the first, which was pulled by engine 56. That information was not in conflict with the written orders given Homer, or the signals carried by the train, but in full accord with the same. The railroad company offered evidence tending to show that a time card fixed the meeting points of all regular trains upon the road, and fixed the time at which all regular trains would arrive and depart from each station; that the time card fixing the time of all regular trains at each station would give all the information necessary to enable them to avoid regular trains; that in addition to the time card and the orders given directly by the train dispatcher, a system of train signals was in use on the road, and two red flags by day and two red lights by night carried on the front end of an engine indicated, (1), that another train was following the train carrying the red lights; (2), that such following train had the same rights to the track that the train carrying the signals had; that by the rules of the road the engineer carrying these signals was required on meeting any train to sound his whistle five times as a signal, to call the attention of the train he was meeting to the fact that he was carrying signals for a following train; and that it was the duty of the engineer of the meeting train to answer this signal by one blast of his whistle as a token that he saw the signals the other train was carrying; that when a conductor met a train carrying signals it was his duty to remain on the side track until all the sections of the following train arrived, even if it had to wait twenty-four hours; that wherever a train was to disregard the signals thus carried on the front of an engine, a specific order was given, directing them "to run regardless of the signals carried by No. 11" (or whatever the train number might be), and the order would read, for instance, "Meet No. —— at Macon, and run to [whatever point you wanted] regardless of signals carried by

No. —;" that two-thirds of all the railroad companies in the United States use the same train order in making a meeting point for trains as was used on the Hannibal & St. Joseph railroad; that this order, or double system of orders, had been in use upon the "Hannibal" road since 1876; that Homer had been a conductor upon that road for two years prior to the collision of September 21, 1884, and had been in the service of the company six years prior to that time.

On the part of Kanaley, C. P. Cochran testified that he was a train dispatcher at Atchison; that he had been engaged in that business something over twelve years; that he had been employed as a train dispatcher on the Central Branch railroad, the A. & N. railroad, and the Missouri Pacific railroad; that he did not know of his own personal knowledge of the methods in use in other quarters of the country for moving trains; that his places of service had been in Kansas; and that in giving an order to a train to meet one or more sections of another train at a given point it was always the practice to designate the trains and engines necessary for them to have orders against; and that if a certain train contained two sections, that information ought to be stated in the dispatch.

On the part of Kanaley, Samuel McDonald also testified that he lived at Atchison, and was a telegraph operator; that he worked at the union depot for all roads; and had been engaged in such business for over six years; that he had been a train dispatcher in 1885 on the Nashville & Chattanooga railroad; and that it was about the rule of all roads to give the number of sections you wanted another train to meet. Upon cross-examination, he changed his evidence by saying that the rule applied to the railroads that he had worked for; they were the Missouri Pacific railroad, the Chicago, Burlington & Quincy railroad in Iowa, the Kansas City, St. Joseph & Council Bluffs railroad, and some others; he had no knowledge what system was in use for moving trains upon the Hannibal & St. Joseph railroad in 1884, or at the time of the trial.

The railroad company asked the court to give the following instruction:

"The fact that upon another railroad a different form or wording for the order is used, or the fact that another train dispatcher, in issuing train orders directing the movements of a train which is to meet another train composed of two or more sections, would ordinarily specify the number of sections composing said train, does not justify the jury in coming to the conclusion that the train order introduced in evidence in this case, which was intended to be used on defendant's road, was insufficient, and not reasonably well calculated to advise Homer of the fact that there was a second section of train No. 11, and provide for the safety and security of said train."

This was refused, and no other instruction similar was given. We think this material error. In *A. T. & S. F. Rld. Co. v. Wagner*, 33 Kas. 660, Mr. Justice VALENTINE, speaking for the court, said:

"We think the following principles are deducible from the authorities, and are sound law: (1.) An employé of a railroad company, by virtue of his employment, assumes all the ordinary and usual risks and hazards incident to his employment. (2.) As between a railroad company and its employés, the railroad company is not an insurer of the perfection of any of its machinery, appliances or instrumentalities for the operation of its railroad. (3.) As between the railroad company and its employés, the railroad company is required to exercise reasonable and ordinary care and diligence, and only such, in furnishing to its employés reasonably safe machinery and instrumentalities for the operation of its railroad. (4.) It will be presumed, in the absence of anything to the contrary, that the railroad company performs its duty in such cases, and the burden of proving otherwise will rest upon the party asserting that the railroad company has not performed its duty."

The law does not require a railroad company to direct the movement of its trains by orders from the train dispatcher

3. Railroad trains; movement, how to be directed.

alone, nor does the law require it to adopt any particular form of orders, or any particular system for communicating them; but a company has the right to direct the movement of its trains by train orders

alone, or by train orders and signals, or by signals alone, or by time card alone. The law only requires that the means adopted shall be brought to the knowledge of its employés; and that they be reasonably well calculated to secure the safety of the employés, if obeyed.

Again, a railroad company is not required to change its orders, or signals, for the movement of its trains, because some other railroad company has adopted a different system of orders, or signals. A railroad company may even have in use a system of orders or signals shown to be less safe than that adopted by another railroad company, without being liable to its employés for the consequences of the use of such orders, or signals. If the employé thinks proper to continue in the service of the company with the knowledge of the orders or signals in use, it is at his own risk, and all that he can require of the company, is that he shall not be deceived as to the degree of danger he incurs. As before decided: "Between the railroad company and its employés, the railroad company is required to exercise reasonable and ordinary care and diligence, and only such, in furnishing to its employés reasonably safe machinery and instrumentalities for the operation of its road."

*4. Movement of trains; character of orders and signals.*

*6. Machinery, to be reasonably safe.*

It was proper for the trial court to admit any evidence tending to show that the orders and signals adopted by the Hannibal & St. Joseph Railroad Company were not reasonably well calculated to secure the safety of its servants and employés; but evidence that the Missouri Pacific railroad and some other railroads use a different system, did not tend, of itself, to show that the defendant below was guilty of negligence in the use of the orders and signals adopted by it; in other words, whether the Hannibal & St. Joseph Railroad Company was guilty of negligence in the use of a certain system in the movement of its trains, cannot be determined by the fact that several other roads use a different system. (*Smith v. Rld. Co.*, 69 Mo. 32; *Muirhead v. Rly. Co.*, 19 Mo. App. 634.)

*5. Negligence, when not shown.*

If Cochran and McDonald had been train dispatchers upon the Hannibal & St. Joseph railroad, and had testified that the order given to Homer at Brookfield was not the usual and customary order given upon that road, their evidence would have been competent; or, if these witnesses had testified that under the system of train signals and orders in use upon that road, various accidents had occurred attributable to the form of train orders and signals in use, their evidence would have tended to show that the orders and signals adopted on the road were not reasonably well calculated to secure the safety of the employés, even if obeyed; but nothing of this kind was shown; or attempted to be shown.

Noah Northcut testified, on the part of the railroad company, that he was the conductor of the first section of train No. 11, on September 21, 1884; that it was composed of two sections and that he had orders that day to meet engine 67 at Lingo; that he was carrying signals for the second section of his train; that the second section of his train, which he was flagging, was pulled by engine 56; that as his caboose passed train 67 at Lingo, he said to Homer—who was within fourteen feet of him—"that he was carrying signals for engine No. 56;" and, also, "hallooed to the men on engine 67, as he passed them, that he was flagging 56." Homer testified that as the first section of No. 11 reached Lingo, "he understood them to say they were flagging 57, when they passed him." Upon this and the other evidence, the following instruction, which was refused, ought also to have been given:

"If you find from the evidence that Conductor Homer saw the red lights carried by the engine pulling the first section 7. Conductor, of train No. 11, as said train passed him at Lingo disregarding station, and by seeing said lights, knew that a orders; proper second section of train No. 11 was following the instruction. first, which was entitled to the same rights to the track as had been given to the first section of said train No. 11, by the train dispatcher in the order which he [Homer] had received, for the running of his own train, then the court instructs you that the said Homer was in duty bound to obey the signals so seen and understood by him. He had no right to speculate as to the number of the engine or train following the first

section of train No. 11, nor would he be justified under his orders in disregarding the directions conveyed by said signals, by any information he might receive from the conductor of the first section of train No. 11."

As is well said by counsel of Kanaley, "The first law of nature, self-preservation, would have prevented Homer from running the risk of his life in the disobedience of orders, which notified him that another train was on the track;" and from these premises they argue that the jury had the right to conclude, because Homer pulled out and went on with his train after the first section of No. 11 passed Lingo, that the train dispatcher was negligent in not notifying him that No. 11 consisted of two sections. If, however, Homer understood the conductor of the first section of No. 11 to say "he was flagging engine 57," this explains Homer's disregard of the signals on first section of train No. 11, and his failure to remain at Lingo until both sections of that train had passed his train. If he acted upon a misunderstanding of the words of the conductor of the first section of train No. 11, then he had no thought that he was risking his life, or putting himself in peril in disregarding the signals carried.

For the errors heretofore referred to and commented upon, the judgment of the district court will be reversed, and the cause remanded for a new trial.

All the Justices concurring.